IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

ANTHONY KEITH McFALLS, JR.,
     Plaintiff,

vs.                              Case No.: 5:12cv35/EMT

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,[1]
     Defendant.
_____/

## MEMORANDUM DECISION AND ORDER

This case has been referred to the undersigned magistrate judge for disposition pursuant to the authority of 28 U.S.C. § 636(c) and FED. R. CIV. P. 73, based on the parties' consent to magistrate judge jurisdiction (*see* docs. 9, 10).  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act"), for review of a final decision of the Commissioner of the Social Security Administration ("Commissioner") denying Plaintiff's application for Supplemental Security Income ("SSI") benefits under Title XVI of the Act, 42 U.S.C. §§ 1381–83.

Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

I.     PROCEDURAL HISTORY

On October 22, 2008, Plaintiff filed an application for SSI, and he alleged therein disability beginning June 5, 2004, although he later amended the alleged onset date to October 22, 2008 (tr. 10).[2]  Plaintiff's application was denied initially and on reconsideration, and he then requested a

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.  Pursuant to FED. R. CIV. P. 25(d), she is therefore automatically substituted for Michael J. Astrue as the Defendant in this case.

[2] All references to "tr." refer to the transcript of Social Security Administration record filed on June 14, 2012 (doc. 8).  Moreover, the page numbers refer to those found on the lower right-hand corner of each page of the transcript, as opposed to those assigned by the court's electronic docketing system or any other page numbers that may appear.

hearing before an administrative law judge ("ALJ"). A hearing was held on April 26, 2011, at which Plaintiff was represented by counsel, and Plaintiff and a vocational expert testified (tr. 10). On May 11, 2011, the ALJ issued a decision in which he found Plaintiff "not disabled," as defined under the Act, at any time through the date of his decision (tr. 10–22). The Appeals Council subsequently denied Plaintiff's request for review (*see* tr. 1). Thus, the decision of the ALJ stands as the final decision of the Commissioner, subject to review in this court. Ingram v. Comm'r of Soc. Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007). This appeal followed.

II.    FINDINGS OF THE ALJ

On May 11, 2011, the ALJ made several findings relative to the issues raised in this appeal (*see* tr. 10–22):

1)    Plaintiff has not engaged in substantial gainful activity since October 22, 2008, the amended alleged onset date and the date he filed his application for SSI.[3]

2)    Plaintiff has the following severe impairments: thoracolumbar scoliosis, major depressive disorder, pain disorder, delusional disorder, intermittent explosive disorder, and posttraumatic stress disorder.

3)    Plaintiff has no impairment or combination of impairments that meets or medically equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.

4)    Plaintiff has the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 416.967,[4] with the additional limitations of no climbing ladders, ropes, or scaffolds; only occasional balancing, stooping, kneeling, crouching, crawling, or climbing ramps and stairs; no concentrated exposure to workplace hazards such as hazardous machinery and unprotected heights; and no

---

[3] The time frame relevant to Plaintiff's claim for SSI is October 22, 2008 (amended alleged onset date), through May 11, 2011 (date of ALJ's decision). See Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005) (noting that SSI claimant becomes eligible to receive benefits in the first month in which he is both disabled and has an SSI application on file).

[4] Light work is defined in 20 C.F.R. § 416.967(b) as follows:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

work that requires more than simple, repetitive, and routine tasks, with only occasional interaction with co-workers and supervisors.

5) Plaintiff is unable to perform any of his past relevant work.

6) Plaintiff was born on May 15, 1978, and was thirty years of age on the date he applied for SSI, and thus he is considered a "younger individual" (*see* 20 C.F.R. § 416.963(c) (defining younger individual as one between the ages of 18 and 49 and noting that such age(s) generally will not seriously affect the person's ability to adjust to other work)).

7) Plaintiff has a limited education and is able to communicate in English.

8) Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Plaintiff is "not disabled," whether or not he has transferable job skills.

9) Considering Plaintiff's age, education, work experience, and RFC, there are jobs existing in significant numbers in the national economy that Plaintiff can perform; Plaintiff, therefore, was not disabled, as defined in the Act, between October 22, 2008, and May 11, 2011.

III. STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987). "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles." Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991). As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995). Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed.

2d 842 (1971) (quoting <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); <u>Lewis</u>, 125 F.3d at 1439. The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. <u>Sewell v. Bowen</u>, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id*. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g),[5] the Commissioner analyzes a disability claim in five steps:

1.      If the claimant is performing substantial gainful activity, he is not disabled.

2.      If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

3.      If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.      If the claimant's impairments do not prevent him from doing his past relevant work, he is not disabled.

---

[5] In general, the legal standards applied are the same regardless of whether a claimant seeks Disability Insurance Benefits ("DIB") or SSI, but separate, parallel statutes and regulations exist for DIB and SSI claims (*see* 20 C.F.R. §§ 404, 416). Therefore, citations in this Order should be considered to refer to the appropriate parallel provision. The same applies to citations of statutes or regulations found in quoted court decisions.

5.      Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates his RFC and vocational factors, he is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps him from performing his past work. 20 C.F.R. § 404.1512. If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, the claimant must then prove he cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.    PLAINTIFF'S MEDICAL HISTORY[6]

As previously noted, the time frame relevant to this appeal is October 22, 2008, through May 11, 2011. There are, however, no treatment records in the file—as to Plaintiff's physical or mental conditions—from the relevant time frame, although there are records from various consultative examiners and non-examining agency experts from the relevant time. The court will nevertheless discuss all of the available evidence in order to fully describe Plaintiff's impairments.

A.      Plaintiff's Physical Impairments

Evidence that pre-dates the time frame relevant to this appeal

Plaintiff was involved in two motor vehicle accidents ("MVAs") well before the alleged onset date, and he received care at an emergency room ("ER") following each accident. The ER records related to the first MVA, which occurred in October 2002, reveal that Plaintiff presented with complaints of headaches, dizziness, a nosebleed, pain and spasms in his left arm, and back and hip pain that was radiating down his right leg. Computerized tomography ("CT") scans were obtained of the lumbar spine, right hip, and brain, and all resulted in negative findings. ER records from June 2004, following the second MVA, reflect that Plaintiff complained of lower back pain and rated its severity at a five on a ten-point scale. Plaintiff was discharged with pain medications and instructed to follow-up with his primary care physician in two to three days. Approximately one

---

[6] Unless otherwise noted, the information in this section is derived from the ALJ's opinion (tr. 10–22).

month later, magnetic resonance imaging ("MRI") scans of the thoracic and lumbar spine were obtained and revealed minimal thoracolumbar scoliosis, possibly positional in nature (tr. 218), but no other significant findings or abnormalities (tr. 16).

In August 2004, Plaintiff was referred to a neurologist to rule out lumbosacral radiculopathy because of his continued complaints of lower back pain radiating to his right leg.  An electro-physiological examination revealed no evidence of lumbosacral radiculopathy and otherwise was within normal limits.  Due to his complaints of pain, however, Plaintiff was referred for physical therapy ("PT").

Plaintiff began PT on August 16, 2004 (tr. 225).  He reported difficulty lifting and caring for his baby, bending over to the floor, and putting on slacks and socks.  Plaintiff's range of motion was within normal limits in all upper and lower extremities, and his strength was full and within normal ranges in his upper extremities and nearly full (4/5 or 4+/5) or full (5/5) in his lower extremities (tr. 225–26).  Additionally, Plaintiff's reflexes were "equal and active bilaterally" in the lower extremities (tr. 226).  Plaintiff displayed some tenderness to palpation and reduced range of motion in his back, and he reported that pain limited further movement (tr. 226–27).  Plaintiff returned for seven PT sessions between August 19 and September 3, 2004, at which time he was noted to be "slightly improved" (tr. 236–37).  Treatment notes reflect that, on September 3, 2004, Plaintiff was discharged because he had demonstrated an "ability to modify essential activities of daily living, to safely compensate for residual impairment while reducing the risk of re-injury" and an understanding of his home exercise instructions (tr. 236).  The PT notes also reflect that Plaintiff would be sent back to his referring physician for a reassessment, as Plaintiff had not "progress[ed] as anticipated" (*id.*).

Plaintiff presented to Merle P. Stringer, M.D., a neurologist, at or near the end of his PT (tr. 245–46).  Dr. Stringer, who noted the reduced range of motion in Plaintiff's back, administered a paravertebral block and lumbar facet injection on September 29, 2004, which—Plaintiff reported—worsened his symptoms (tr. 246).  Following an essentially normal physical examination and a review of spinal MRI results (which showed some minor disc bulging but no significant nerve root compression or spinal stenosis), Dr. Stringer opined there was no further treatment he could provide from a neurosurgical standpoint (tr. 245; *see also* tr. 244 (MRI results)).  He also opined that

Plaintiff had reached maximum medical improvement, and he assessed a seven percent impairment rating to Plaintiff's "whole person" based on his lower back symptomatology (tr. 245). Dr. Stringer referred Plaintiff to Iqbal A. Faruqui, M.D., Plaintiff's primary care physician (*id.*).

Although the treatment notes are illegible, it appears that Plaintiff saw Dr. Faruqui on three occasions in 2004 and on one occasion in January 2005 (tr. 239–42). It also appears that Dr. Faruqui administered or recommended conservative treatment for Plaintiff's back condition, such as the use of transcutaneous electrical nerve stimulation (i.e., a "TENS unit") and Flexeril (*see* tr. 236).

Evidence from the time frame relevant to this appeal

On February 4, 2009, at the request of the Social Security Administration ("SSA"), Plaintiff underwent a consultative physical examination by Dr. Faruqui (tr. 248–52). Plaintiff described his back pain as constant and stated it was aggravated by activity but lessened with the use of a TENS unit or over-the-counter pain medication (tr. 248–50). A physical examination revealed positive straight leg raising tests, negative deep tendon reflex tests, and tenderness over the spinal column and paraspinal muscles, with muscle spasm (tr. 251). Dr. Faruqui noted Plaintiff's unremarkable MRI and neurological work-up, as well as Plaintiff's report of unsuccessful trigger point injections, but he offered no specific assessment or recommendation as to Plaintiff's condition or physical capacities (*see* tr. 251–52).

On February 25, 2009, Donald Morford, M.D., a non-examining agency physician, completed a physical RFC assessment (tr. 253–60). He opined that Plaintiff can occasionally and frequently lift or carry ten pounds, and he can stand or walk two hours in an eight-hour workday and sit six hours in a workday (tr. 254). He also opined that Plaintiff can push or pull without limit but is occasionally limited with regard to postural activities, such as climbing ramps or stairs, balancing, stooping, kneeling, crouching, or crawling, although Plaintiff is totally restricted from climbing ladders, ropes or scaffolds (tr. 254–55). Additionally, Dr. Morford opined that Plaintiff has no manipulative, visual, communicative, or environmental limitations, with one exception (that is, that Plaintiff must avoid concentrated exposure to hazards such as machinery or heights) (tr. 256–57). Dr. Morford noted that although Plaintiff's reports of back pain are "persistent and well documented," Plaintiff appears to have slightly exaggerated his symptoms (tr. 258).

In October 2009, Plaintiff was examined by Stanford A. Williamson, D.O., at the request of the SSA (tr. 289–95). Range of motion testing of the cervical and lumbar spine revealed no deficits, although Plaintiff was tender to touch at certain areas (tr. 291). And range of motion testing of the upper and lower extremities, bilaterally, revealed no deficits (*id.*). Plaintiff's entire neurological testing was normal and revealed, in pertinent part, negative straight leg raising tests and full strength, bilaterally, in the upper and lower extremities (*id.*). Dr. Williamson also noted that Plaintiff walked on his toes "with ease" and needed no assistive device (tr. 291). He assessed chronic thoracic and lumbar back pain without any signs of radiculopathy (*id.*).

On December 14, 2009, a second non-examining agency physician completed a physical RFC assessment (tr. 315–22). Clarence Louis, M.D., opined that Plaintiff can occasionally lift or carry twenty pounds and frequently lift or carry ten pounds, stand or walk six hours in an eight-hour workday, and sit six hours in a workday (tr. 316). He also opined that Plaintiff can push or pull without limit and has no postural, manipulative, visual, communicative, or environmental limitations (tr. 316–19). Dr. Louis noted that in reaching his opinions he considered that Plaintiff appeared to have exaggerated the severity of his symptoms (*see* tr. 320).

B.      Plaintiff's Mental Impairments (all evidence is from the relevant time frame)

In March 2009, at the request of the SSA, Plaintiff underwent a consultative psychological evaluation by Dr. George L. Horvat, Ph.D. (tr. 262–65). Plaintiff reported a prior history of mental health treatment when he was imprisoned in Georgia in 1998, which did not result in any in-patient treatment and is apparently the only mental health treatment he ever received (tr. 263). Plaintiff noted that his chief complaint was "back problems," for which he took Tylenol and ibuprofen (tr. 262–63). Based on Dr. Horvat's clinical interview, behavioral observations, mental status examination, review of available records, and test results, Dr. Horvat diagnosed Plaintiff with posttraumatic stress disorder, pain disorder, major depressive episode (severe), and delusional disorder (persecutory type) (tr. 264–65). Dr. Horvat recommended treatment but noted that any treatment program could be scheduled around Plaintiff's work commitments and that there were "no psychological reasons why [Plaintiff could not] work" (tr. 265).

In May 2009, Steven Wise, Psy.D., a non-examining agency psychologist, completed a mental RFC assessment (tr. 266–69). Dr. Wise evaluated Plaintiff's capacities in twenty areas of

functioning and concluded that Plaintiff is "not significantly limited" in fifteen areas and "moderately limited" in five areas (tr. 266–67). He also opined that Plaintiff can "complete a normal workweek without excessive interruptions from psychologically based symptoms," but Plaintiff should likely be limited to "simpler tasks" and—although Plaintiff can relate to coworkers and supervisors—he may have some difficulty with supervisors (tr. 268). Dr. Wise also completed a Psychiatric Review Technique form ("PRTF"), on which he evaluated Plaintiff's psychiatric condition under Section (or "Listing") 12.03 of 20 C.F.R. Part 404, Subpart P, Appendix 1 (Psychotic Disorders), Listing 12.04 (Affective Disorders), and Listing 12.06 (Anxiety-Related Disorders) (tr. 270–83). Dr. Wise assessed delusional disorder, major depressive disorder, and post-traumatic stress disorder under the three listings, respectively, but opined that none of the disorders satisfy the diagnostic criteria of those listings (tr. 272, 273, 275). With regard to the "B Criteria" of Listings 12.03, 12.04, and 12.06, Dr. Wise opined that Plaintiff has mild restrictions in activities of daily living, moderate restrictions in maintaining social functioning and concentration, persistence or pace, and no episodes of decompensation (tr. 280). Dr. Wise also noted that Plaintiff's conditions do not satisfy the "C Criteria" of the three listings (*see* tr. 281).

Dr. Horvat examined Plaintiff a second time, on October 19, 2009, again at the request of the SSA (tr. 285–88). Dr. Horvat amended his diagnoses to include intermittent explosive disorder, apparently based on Plaintiff's reported inability get along with other people. Dr. Horvat also assessed a "current GAF" of 50,[7] and he continued to opine that Plaintiff is capable of work from a psychological standpoint (tr. 288).

On December 10, 2009, Judith E. Meyers, Psy.D., a non-examining agency psychologist, completed a PRTF form (tr. 297–314). She assessed delusional disorder (persecutory type), major depressive disorder (recurrent, moderate), posttraumatic stress disorder, pain disorder, and

---

[7] Global assessment of functioning, or GAF, is the overall level at which an individual functions, including social, occupational, academic, and other areas of personal performance. American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u> 30–32 (4th ed. 1994) ("DSMM - IV"). It may be expressed as a numerical score. *Id.* at 32. A score between 41 and 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.* . A score between 51 and 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.*

intermittent explosive disorder, and she evaluated these conditions under Listings 12.03, 12.04, 12.06, 12.07 (Somatoform Disorders), and 12.08 (Personality Disorders), respectively (tr. 299, 300, 302, 303, 304). With regard to the "B Criteria" of each of the five listings, Dr. Meyers opined that Plaintiff has no restrictions in activities of daily living, moderate restrictions in maintaining social functioning, mild restrictions in maintaining concentration, persistence or pace, and no episodes of decompensation (tr. 307). Dr. Meyers also noted that Plaintiff's conditions do not satisfy the "C Criteria" of Listings 12.03, 12.04, and 12.06 (*see* tr. 308). Finally, Dr. Meyers completed a mental RFC assessment form (tr. 311–14). She evaluated Plaintiff's capacities in twenty areas of functioning and concluded that Plaintiff is "not significantly limited" in eighteen areas and "moderately limited" in two areas (tr. 311–12).

V.     DISCUSSION

Plaintiff raises several claims in this appeal, which will be discussed in the following order. First, Plaintiff contends the ALJ erred in discounting his subjective complaints of pain and other symptoms (doc. 12 at 15–19). Second, Plaintiff contends the ALJ erred in failing to resolve conflicts between the opinions of Dr. Morford and Dr. Louis (*id.* at 19–20). Third, Plaintiff claims the ALJ erred in assigning significant weight to the opinion Dr. Horvat (rendered on two occasions) that there are no psychological reasons that prevent Plaintiff from working (*id.* at 10–11). And fourth, Plaintiff contends the ALJ erred in determining his mental RFC, because the RFC does not include "a portion of the findings of Dr. Horvat, Dr. Wise, and Dr. Meyers" (*id.* at 9, 11–15).

A.     Evaluation of Plaintiff's Subjective Complaints

Plaintiff testified at his hearing before the ALJ that he cannot work due to back pain (tr. 37). He also claimed that due to his pain he cannot walk more than 100 yards or "sit long," it is a "chore to go the bathroom some days by [him]self," and he cannot "half wash [him]self" (tr. 37, 42). Plaintiff testified that since the MVA (he did not indicate which MVA) he "constantly [has] headaches," and at least four times a week he has muscle spasms in his back and legs that last "generally all night" and are "so bad [he] can't even sleep in the bed with [his] wife because they wake her up" (tr. 45). He reported that although his primary barrier to employment is back pain, his "explosive attitude" raises serious doubts about his ability to hold a job, as it has "cost him about every job [he has] ever had" (tr. 37). Plaintiff stated he spends his days lying or sitting, but he also

goes fishing about four or five times a year and shopping with his wife, although he claimed when he shops he needs to ride in a motorized cart (*see* tr. 38, 41–42). He also stated that until one week prior to his hearing he picked his son up from school every day; he recently stopped picking him up only because the family moved and his son can now ride the school bus, but Plaintiff nevertheless remains capable of driving short distances (tr. 41–42). He testified that he performs no yard work or home maintenance and does not cook (tr. 39, 41–43). Finally, Plaintiff stated that he stays "sick to his stomach all the time since the car accident," but he does not know what causes this sickness, and he has not sought or obtained treatment for it because he cannot afford to do so (tr. 46–47). After considering this testimony, the ALJ rejected the parts of it, which—if believed—would preclude sustained, competitive work activity. Plaintiff contends the ALJ erred in doing so but, for the reasons discussed below, the undersigned finds Plaintiff's contention unavailing.

Pain and other subjective complaints are treated by the Regulations as symptoms of disability. Title 20 C.F.R. § 404.1529 provides in part that the Commissioner will not find disability based on symptoms, including pain alone, ". . . unless medical signs or findings show that there is a medical condition that could be reasonably expected to produce these symptoms." The Eleventh Circuit has articulated a three-part pain standard, sometimes referred to as the Hand test, as follows:

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.

Hand v. Heckler, 761 F.2d 1545, 1548 (11th Cir. 1986) (originally adopting the three-part pain standard). The Eleventh Circuit continues to follow the Hand test. Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002) (citing Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991); Ogranaja v. Commissioner of Social Security, 186 F. App'x 848, 2006 WL 1526062, at *3 (11th Cir. June 5, 2006) (quoting Wilson); Elam v. Railroad Retirement Bd., 921 F.2d 1210, 1216 (11th Cir. 1991).

Underlying the Hand standard is the need for a credibility determination concerning a plaintiff's complaints. Those complaints are, after all, subjective. "[T]he ascertainment of the existence of an actual disability depend[s] on determining the truth and reliability of [a claimant's] complaints of subjective pain [or other symptom]." Scharlow v. Schweiker, 655 F.2d 645, 649 (5th Cir. Sept. 1981) (holding that the ALJ must resolve "the crucial subsidiary fact of the truthfulness

of subjective symptoms and complaints").[8]  People with objectively identical conditions can experience significantly different levels of pain, and pain is more readily treated in some than in others.  "Reasonable minds may differ as to whether objective medical impairments could reasonably be expected to produce [the claimed symptom].  This determination is a question of fact which, like all factual findings by the [Commissioner], is subject only to limited review in the courts to ensure that the finding is supported by substantial evidence."  Hand, 761 F.2d at 1548–49.  It is within the ALJ's "realm of judging" to determine whether "the quantum of [symptoms a claimant] allege[s] [is] credible when considered in the light of other evidence."  Arnold v. Heckler, 732 F.2d 881, 884 (11th Cir. 1984).  The evidence as a whole, including the existence of corroborating objective proof or the lack thereof, and not just a physician's belief or the plaintiff's claims, is the basis for the ALJ's credibility determination.

Finally, "[i]f the Commissioner refuses to credit [subjective testimony of the claimant] he must do so explicitly and give reasons for that decision. . . .  Where he fails to do so we hold as a matter of law that he has accepted that testimony as true."  MacGregor, 786 F.2d at1054; Holt, 921 F.2d at 1223.  "Although this circuit does not require an explicit finding as to credibility, . . . the implication must be obvious to the reviewing court.  The credibility determination does not need to cite particular phrases or formulations but it cannot merely be a broad rejection which is not enough to enable [the district court or this Court] to conclude that [the ALJ] considered [plaintiff's] medical condition as a whole."  Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005) (internal quotations and citations omitted).  The reasons articulated for disregarding the plaintiff's subjective pain testimony must be based upon substantial evidence.  Jones v. Dep't of Health and Human Serv's, 941 F.2d 1529, 1532 (11th Cir. 1991).

Here, the ALJ identified several reasons for his decision to discount the more extreme of Plaintiff's complaints, including the following reasons.  The ALJ first noted that Plaintiff's testimony was internally inconsistent.  For example, the ALJ found that Plaintiff's reported inability to "sit long" was inconsistent with his testimony that he spends his days sitting or lying around the house (tr. 15).  Plaintiff's alleged limited ability to sit is also inconsistent with his reported ability

---

[8] Decisions of the United States Court of Appeals for the Fifth Circuit decided on or before September 30, 1981 are binding precedent in the Eleventh Circuit.  Bonner v. Pritchard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

to ride on motorized carts while shopping. The ALJ additionally found that Plaintiff's ability to go fishing when he so desires, pick up his son every day from school, and shop, are inconsistent with his allegations of extreme and disabling physical limitations (tr. 15). Next, the ALJ noted that Plaintiff received absolutely no medical treatment since 2005 (tr. 16). Indeed, as detailed *supra*, Plaintiff's last medical appointment was in January of 2005, which is nearly four years prior to the date Plaintiff alleges he became disabled. Similarly, the ALJ pointed to Plaintiff's total failure to ever seek any form of mental health treatment (other than during his incarceration), much less than during the time frame relevant to this appeal, and found that such failure undermines any claim of truly disabling mental limitations (*see* tr. 16). The ALJ did not err in discrediting Plaintiff's complaints based on his daily activities and lack of physical or mental health treatment. *See* Watson v. Heckler, 738 F.2d 1169, 1173 (11th Cir. 1984) (in addition to objective medical evidence, it is proper for ALJ to consider use of painkillers, failure to seek treatment, daily activities, conflicting statements, and demeanor at the hearing); Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995) (failure to seek medical treatment for a long time during a claimed period of disability tends to indicate tolerable pain); Williams v. Sullivan, 960 F.2d 86, 89 (8th Cir. 1992) (absence of treatment indicates that a mental impairment is non-severe).

Continuing, the ALJ noted that no treating physician imposed, specified, or recommended any restrictions, as would be expected if Plaintiff is as limited as he alleges (tr. 16). This, too, was a factor properly considered by the ALJ. *See, e.g.*, Posey v. Astrue, No. 3:07cv356/MCR/EMT, 2008 WL 4187003, at *11 (Sept. 5, 2008) (ALJ properly considered that claimant's treating physician imposed no specific functional limitations resulting from her impairments) (citing Brown v. Chater, 87 F.3d 963, 964–65 (8th Cir. 1996)); Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000) ("We find it significant that no physician who examined Young submitted a medical conclusion that she is disabled and unable to perform any type of work.") (citation omitted); Singleton v. Astrue, 542 F. Supp. 2d 367, 378–79 (D. Del. 2008) (in evaluating a plaintiff's credibility, ALJ did not err in considering, among other factors, that "none of [p]laintiff's treating physicians identified any specific functional limitations arising from her fibromyalgia or other conditions that would render her totally disabled"). Indeed, the fact that no physician has opined that Plaintiff is disabled, alone, might be considered substantial evidence for the ALJ's decision. *See*

Rice v. Apfel, 990 F. Supp. 1289, 1294 (D. Kan 1997) (citing Ray v. Bowen, 865 F.2d 222, 226 (10th Cir. 1989)).

Next, the ALJ considered that the objective medical evidence fails to confirm or otherwise substantiate the disabling limitations alleged by Plaintiff (tr. 16). In support, the ALJ first pointed to the treatment records that predate the alleged onset date of October 22, 2008, including: (1) ER records, which include negative CT scans; (2) spinal MRI results, which reveal only minimal thoracolumbar scoliosis and no other significant findings or abnormalities; (3) the results of neurological testing, which rule out radiculopathy and are otherwise within normal limits; and (4) Dr. Stringer's essentially normal physical examination (see tr. 16–17).[9] The ALJ then pointed to evidence from the relevant time frame, which evidence—incidentally—exists only because the Commissioner referred Plaintiff for consultative examinations and solicited the opinions of non-examining agency physicians and psychologists. With regard to Plaintiff's complaints of extreme physical limitations, the ALJ noted that Dr. Williamson's examination in October 2009 was essentially normal (tr. 18). He also noted that both non-examining agency physicians, Dr. Morford and Dr. Louis, opined in 2009 that Plaintiff is physically able to work (tr. 18–19). Although the non-examining physicians' opinions are not identical, both of their opinions are nevertheless inconsistent with the extreme limitations reported by Plaintiff, as the ALJ noted. For example, Dr. Morford—whose opinions are more restrictive than those offered by Dr. Louis—concluded that Plaintiff can sit six hours in an eight-hour workday and stand or walk for two hours. These opinions directly contradict Plaintiff's testimony that he cannot "sit long" or walk more than 100 yards. The ALJ also noted that Dr. Morford and Dr. Louis both indicated that Plaintiff had exaggerated his symptoms (tr. 19). With regard to Plaintiff's mental limitations, the ALJ considered the opinions of Dr. Horvat, who opined that there are no psychological barriers to Plaintiff's employment, and the opinions of Dr. Wise and Dr. Meyers, both of whom assessed only minimal functional limitations and found Plaintiff capable of working (see tr. 18–19).

---

[9] The ALJ acknowledged that Plaintiff's PT records reveal some deficits in Plaintiff's physical abilities, but the ALJ also observed—correctly—that during his PT (in August and September of 2004) Plaintiff learned to modify his daily activities to account for these deficits and reduce the risk of re-injury (tr. 16–17).

In conclusion, because the ALJ articulated the inconsistencies on which he relied in discrediting Plaintiff's complaints of disabling limitations, and because the ALJ's reasons are supported by substantial evidence on the record as a whole, the ALJ's credibility finding should not be disturbed.

B.     Opinions of Dr. Morford and Dr. Louis, Non-Examining Agency Experts

Plaintiff next contends the ALJ erred in failing to resolve conflicts between the opinions of Dr. Morford, who generally opined that Plaintiff is capable of performing sedentary work, and Dr. Louis, who generally opined that Plaintiff is capable of performing light work (doc. 12 at 19–20). Again, however, Plaintiff's contention is unconvincing.

The ALJ gave "substantial weight" to the opinions of Dr. Louis, and he gave "less significant weight" to the opinions of Dr. Morford (tr. 17–18). In support, the ALJ found that Dr. Louis' opinions are more consistent with the evidence of record, which evidence—as discussed in the preceding section—is unremarkable and fails to substantiate any significant functional limitations (tr. 18). Importantly, however, the ALJ did not fully or blindly adopt Dr. Louis' opinions over those of Dr. Morford; rather, he included in Plaintiff's RFC limitations that are greater than those assessed by Dr. Louis and consistent with those assessed by Dr. Morford. For example, Dr. Louis opined that Plaintiff has no environmental or postural limitations, but the RFC restricts Plaintiff from certain environmental workplace hazards and postural activities, such as climbing ladders, ropes or scaffolds (which restrictions are nearly identical to the environmental and postural limitations assessed by Dr. Morford). Thus, although the ALJ assigned less weight to Dr. Morford's opinions, it is evident that the ALJ did not wholly reject them or, conversely, wholly adopt the opinions of Dr. Louis. Rather, the ALJ carefully considered both opinions and determined that, overall, Dr. Louis' opinions were more consistent with the record as a whole. Therefore, the ALJ did not err in failing to reconcile differences in the opinions of Dr. Morford and Dr. Louis, or by failing to explain why he did so, as Plaintiff alleges. The ALJ also did not err in concluding that Plaintiff is capable of performing light work, as Dr. Louis opined, with certain environmental and

postural restrictions, as generally assessed by Dr. Morford,[10] as these conclusions are well supported by substantial evidence on the record as a whole.

C.       Opinions of Dr. Horvat

Plaintiff claims the ALJ erred by assigning significant weight to the opinion of Dr. Horvat (that from a psychological standpoint, Plaintiff is not precluded from work). In support, Plaintiff asserts that Dr. Horvat is a treating physician, and that his treatment records do not support his opinion that Plaintiff's mental limitations would not preclude him from work (doc. 12 at 10).

Initially, Plaintiff's characterization of Dr. Horvat as a "treating physician" is erroneous. Plaintiff was referred to Dr. Horvat by the Commissioner on two occasions for consultative examinations. Thus, Dr. Horvat is considered a "nontreating source." *See* 20 C.F.R. § 404.1502 (a nontreating source is a "physician, psychologist, or other acceptable medical source who has examined you but does not have, or did not have, an ongoing treatment relationship with you," including "an acceptable medical source who is a consultative examiner for us, when the consultative examiner is not your treating source"); *see also* Bowman v. Comm'r, Soc. Sec. Admin., CIV. 99-1311-JO, 2001 WL 215790, at *4 (D. Or. Feb. 23, 2001) ("The key issue in determining whether Dr. Gordon was claimant's treating physician is whether his examinations of her were prompted by her need for treatment) (citing 20 C.F.R. § 404.1502); Duke v. Astrue, No. 3:09cv412/MCR/EMT, 2010 WL 3055327 (N.D. Fla. July 16, 2010), *report and recommendation adopted*, 3:09CV412 /MCR/EMT, 2010 WL 3055334 (N.D. Fla. Aug. 3, 2010) (one-time consultative examiner is not a treating physician). Likewise, Dr. Horvat's reports are not "treating

---

[10] While it is true that the ALJ erroneously referred to Dr. Morford as a "one-time examining physician," as Plaintiff points out (doc. 12 at 19 (citing tr. 17)), the error does not affect the ALJ's conclusions or this court's findings. To be sure, after mischaracterizing Dr. Morford's status as an examining physician, the ALJ believed that Dr. Morford's opinions were entitled to more weight than those of Dr. Louis, a non-examining physician. Thus, the ALJ considered very closely the opinions of Dr. Morford, and he carefully explained why he assigned less weight to them. Had the ALJ properly characterized Dr. Morford's status—that is, as a non-examining agency physician—he would have known that his opinions were (at least initially) entitled to the same weight as those of Dr. Louis, and there can be no doubt he would have again found the opinions of Dr. Louis more persuasive. *See, e.g.*, 20 C.F.R. § 404.1527 (every medical opinion should be evaluated, and unless a treating source's opinion is given controlling weight, the following factors are considered in deciding the weight to be given to any medical opinion: examining versus non-examining; treatment relationship (treating sources are given more weight), including length of the treatment relationship, frequency of examination, and the nature and extent of the treatment relationship; supportability of the opinion(s); consistency with the record as a whole; specialization; and "other factors").

records," as Plaintiff contends. But regardless of Dr. Horvat's status as a treating or nontreating source, Plaintiff has not established entitlement to relief on this claim.

Plaintiff claims the ALJ erred by accepting "Dr. Horvat's opinion that he is not precluded from working, without taking into account Dr. Horvat's diagnoses or observations and how they would affect Plaintiff's ability to work" (doc. 12 at 11). It is clear that the ALJ did indeed account for Dr. Horvat's diagnoses, as he included all of them in the list of mental impairments he found severe (namely, major depressive disorder, pain disorder, delusional disorder, intermittent explosive disorder, and posttraumatic stress disorder). The ALJ also solicited opinions from Dr. Wise and Dr. Meyers, who together considered all of the diagnoses assessed by Dr. Horvat and how those conditions affect Plaintiff's mental functioning. And as previously noted, Dr. Wise and Dr. Meyers assessed no more than "moderate" functional limitations. Additionally, Dr. Wise concluded, after reviewing the report from Dr. Horvat's first examination of Plaintiff, that Plaintiff "can complete a normal workweek without excessive interruptions for psychologically based symptoms" (tr. 268). And Dr. Meyers concluded, after reviewing reports from Dr. Horvat's first and second examinations of Plaintiff, that Plaintiff "is able to meet the basic mental demands of work on a sustained basis despite any limitations resulting from [his mental impairments]" (tr. 313). Thus, the ALJ did not err in assigning "significant weight" to the opinion of Dr. Horvat, rendered on two occasions, that Plaintiff is capable of working despite his mental impairments. Dr. Horvat's opinion as to Plaintiff's ability to work is the only one of record offered by an examining source (there are, of course, no treating source records or opinions to consider), and the opinion is consistent with the only other opinions of record, those offered by both non-examining agency experts. Further, the opinions by all three experts—that Plaintiff's mental impairments do not preclude work—are also consistent with evidence establishing that Plaintiff held full-time, gainful employment after his incarceration (during which he received mental health treatment) (*see* tr. 129 (reflecting Plaintiff's employment, for sixty hours per week, between 2001 and 2004)).

D.      RFC Determination

Plaintiff contends the ALJ erred in determining his mental RFC. More specifically, he claims that the ALJ's restrictions—to work that requires no more than simple, repetitive, and routine tasks, with only occasional interaction with co-workers and supervisors—fail to account for all of Plaintiff's mental functional limitations (*see* doc. 12 at 11–15).

Residual functional capacity is an assessment, based upon all of the relevant evidence, of a claimant's remaining ability to do work despite his impairments. *See* Lewis, 125 F.3d at 1440. As stated in 20 C.F.R. § 404.1545(a), it is the most a claimant can still do despite his limitations. "It is the claimant's burden, and not the . . . Commissioner's burden, to prove the claimant's RFC." Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). Although the RFC determination is a medical question, it is not based only on "medical" evidence, that is, evidence from medical reports or sources; rather, an ALJ has the duty, at step four, to assess RFC on the basis of all the relevant, credible evidence of record. *See* Phillips v. Barnhart, 357 F.3d 1232, 1238 (11th Cir. 2004); McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000) (the Commissioner must determine a claimant's RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations); *see also* 20 C.F.R. § 404.1545; Social Security Ruling (SSR) 96-8p.

Here, the ALJ thoroughly considered all of the relevant evidence, including the opinions of Dr. Wise, Dr. Meyers, and Dr. Horvat, and thereafter formulated Plaintiff's mental RFC. The limitation to no more than simple, repetitive, and routine tasks is fully consistent with the opinions: (1) of Dr. Wise, that Plaintiff has no significant limitations in remembering work-like procedures and locations; in understanding, remembering and carrying out short and simple instructions; in making simple work-related decisions; and in maintaining attention and concentration for extended periods (tr. 266, 268); and (2) of Dr. Meyers, that Plaintiff "retains the ability to perform simple, repetitive tasks and likely has abilities to perform tasks at higher levels" and has no significant limitations or only mild limitations in understanding, memory, or sustained concentration and persistence (tr. 313, 311–12, 307). Similarly, the ALJ's limitation to only occasional interaction with co-workers and supervisors is consistent with the opinions: (1) of Dr. Wise and Dr. Meyers, that Plaintiff has no significant limitations in working in coordination with or in proximity to others, in asking simple questions or requesting assistance from others, and maintaining socially appropriate behavior; and that he has moderate limitations in accepting instructions from others, responding appropriately to criticism from supervisors, and getting along with co-workers "without distracting them or exhibiting behavioral extremes" (tr. 266–67, 311–12); (2) of Dr. Wise, that Plaintiff "can relate to supervisors and co-workers," although he might "have some difficulty with supervisors and

distract others at times," but he nevertheless can work full time despite psychologically-based symptoms/limitations (tr. 268); and (3) of Dr. Meyers, that despite Plaintiff's difficulty accepting criticism and potential for distracting his co-workers, he nevertheless retains the mental ability to work and otherwise "meet the basic mental demands of work on a sustained basis" (tr. 313).

Despite the foregoing opinions of Dr. Wise and Dr. Meyers, Plaintiff maintains that the RFC is erroneous because it fails to account for the GAF score assessed by Dr. Horvat and the "many . . . deficits" observed by Dr. Horvat during his consultative examinations, such as deficits exhibited by Plaintiff in the areas of attention, concentration, memory, and judgment (doc. 12 at 12–13). Plaintiff's arguments are unconvincing. Although Dr. Horvat made various observations during the consultative examinations, he did not specifically assess Plaintiff's functional abilities, as did Dr. Wise and Dr. Meyers. Dr. Horvat did, however, twice opine that Plaintiff is mentally able to work. Additionally, after reviewing Dr. Horvat's reports, which include all the observations and comments identified here by Plaintiff, Dr. Wise and Dr. Meyers also concluded Plaintiff is able to work, although they both acknowledged that Plaintiff would have some limitations. They recorded these limitations on their RFC assessments, and the ALJ accounted for them in the RFC.

There simply is no error. Plaintiff's arguments are based on mere speculation (e.g., Plaintiff contends "it is doubtful that [the limitation to occasional interaction with supervisors and co-workers] adequately accounts for [Plaintiff's] persecutory delusional disorder or his intermittent explosive disorder" (doc. 12 at 13)). The experts' opinions, however, are not speculative. For example, Dr. Meyers specifically considered all of Dr. Horvat's diagnoses, including persecutory delusional disorder and intermittent explosive disorder, and she assessed limitations to account for all of these disorders. Thus, in short, the ALJ did not err in relying on the experts' opinions to formulate Plaintiff's mental RFC.

On a final note, Plaintiff contends the ALJ erred by failing to include in the RFC the GAF score assessed by Dr. Horvat (i.e., a score of 50, which reflects "serious symptoms") (doc. 12 at 14–15). Initially, the ALJ acknowledged the score assessed by Dr. Horvat after his second examination of Plaintiff, but the ALJ noted that Dr. Horvat nevertheless continued to opine that Plaintiff was not precluded from work based on psychological limitations, and the ALJ assigned significant weight to this opinion (tr. 18) (and, as previously discussed, the ALJ did not err in doing

so). Additionally, the GAF score was "on the cusp," that is, a score only one point higher would have placed Plaintiff in the "moderate symptoms" range, which range is generally consistent with the ALJ's findings and the opinions of the experts. Furthermore, the DSMM-IV states that the GAF scale is used to report a clinician's opinion as to an individual's level of functioning with regard to psychological, social, <u>and</u> occupational functioning. Thus, the score takes into account non-impairment related functioning in addition to the effects of an individual's impairment. Additionally, "the GAF scale is intended to be used to make treatment decisions, [DSMM-IV] at 32, and nowhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his GAF score." <u>Wilkins v. Barnhart</u>, 69 F. App'x 775, 780 (7th Cir. 2003) (unpublished) (citing DSMM-IV at 32, 34; <u>Howard v. Comm'r. of Social Security</u>, 276 F.3d 235, 241 (6th Cir. 2002)). Thus, the ALJ did not err in failing to specifically find that Plaintiff has "moderate" mental limitations, in failing to include "moderate" mental limitations in the RFC, or in otherwise failing to include the GAF score of 50—or the symptoms associated with GAF scores that range from 41 to 50—in the hypothetical questions he posed to the vocational expert ("VE").

In summary, the ALJ properly considered Plaintiff's subjective complaints and the medical opinions of record. He also based the RFC determination on all of the relevant evidence of record, and the RFC accurately reflects Plaintiff's remaining ability to do work despite his physical and mental impairments. What is more, the ALJ asked the VE to consider a hypothetical individual with the RFC he determined (and with other characteristics, such as Plaintiff's age, work history and educational history) and asked whether the individual—who could not perform Plaintiff's past work—could perform other available work (tr. 48–49). The VE responded "yes," and identified the jobs of bench assembler, electrical products assembler, and agricultural sorter (tr. 49; *see also* tr. 21).[11] The ALJ did not err in relying on the VE's answer to find Plaintiff "not disabled" at step five of the sequential evaluation.

---

[11] The VE also identified several jobs the hypothetical individual could perform if he was limited to sedentary work (tr. 50–51). Thus, even if Dr. Morford's opinions are fully accepted, Plaintiff would still be able to perform other available work.

Case No.: 5:12cv35/EMT

VI.     CONCLUSION

For all of the foregoing reasons, the Commissioner's final decision is supported by substantial evidence and should not be disturbed.  42 U.S.C. § 405(g); <u>Lewis</u>, 125 F. 3d at 1439; <u>Foote</u>, 67 F.3d at 1560.  Furthermore, Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making his findings, or that any other ground for reversal exists.

Accordingly, it is **ORDERED**:

1.      Carolyn W. Colvin is substituted for Michael J. Astrue as Defendant in this action.

2.      The decision of the Commissioner is **AFFIRMED**, that this action is **DISMISSED,** and that the clerk is directed to close the file.

At Pensacola, Florida this 15<u>th</u> day of July 2013.

/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**